# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

**Filing Date:   November 6, 2014**

**NO. 34,531**

**STATE OF NEW MEXICO,**

Plaintiff-Appellee,

v.

**WALTER ERNEST BROWN,**

Defendant-Appellant.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Kenneth H. Martinez, District Judge**

Jody Neal-Post
Albuquerque, NM

Jorge A. Alvarado, Chief Public Defender
Jeff Rein, Assistant Public Defender
Albuquerque, NM

for Appellant


Office of the District Attorney
Guinevere Ice
Albuquerque, NM

for Appellee

**OPINION**

**DANIELS, Justice.**

{1}      The Bill of Rights of the New Mexico Constitution guarantees that "[a]ll persons . . . before conviction" are entitled to be released from custody pending trial without being required to post excessive bail, subject to limited exceptions in which release may be denied in certain capital cases and for narrow categories of repeat offenders. N.M. Const. art. II, § 13. Our rules of criminal procedure provide the mechanisms through which we honor this constitutional right to pretrial release. The rules require that a defendant be released from custody on the least restrictive conditions necessary to reasonably assure both the defendant's appearance in court and the safety of the community. *See* Rule 5-401 NMRA. In this case, Defendant Walter Brown presented the district court with uncontroverted evidence demonstrating that nonmonetary conditions of pretrial release were sufficient to reasonably assure that Defendant was not likely to pose a flight or safety risk. Despite this evidence, the district court ordered that Defendant be held in jail unless he posted a $250,000 cash or surety bond, based solely on the nature and seriousness of the charged offense. We conclude that the district court erred by requiring a $250,000 bond when the evidence demonstrated that less restrictive conditions of pretrial release would be sufficient. We therefore entered an order reversing the district

court's pretrial release order and instructing the district court to release Defendant on appropriate nonmonetary conditions. We now issue this precedential opinion to explain the basis for our decision, to clarify the purposes and controlling legal principles for setting bail, and to provide guidance for future pretrial release decisions.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

{2}      Defendant Walter Brown was arrested on May 26, 2011, and indicted two weeks later on an array of charges, including first-degree felony murder and, alternatively, second-degree murder. The district court imposed a $250,000 cash or surety bond at Defendant's 2011 arraignment. After spending more than two years in pretrial custody awaiting trial because he lacked the financial resources to post such a high bond, Defendant moved the district court to review his conditions of release and to release him under the supervision of the Second Judicial District Court's pretrial services program with appropriate nonmonetary conditions of release. Defendant agreed to accept conditions of release that included monitoring by a GPS device, living with his father, making regular contact with the pretrial services program, and maintaining employment at a local restaurant that had agreed to hire him.

{3}      In support of his motion, Defendant provided the district court with extensive information about his personal history and characteristics. Defendant's nineteenth birthday occurred two months before his arrest in this case. An only child who has always lived with one or both of his parents, he cannot live independently due to developmental and intellectual disabilities. He attended special education classes throughout his school years in Albuquerque and has a second-grade comprehension level for math, writing, and reading. Defendant dropped out of high school during his senior year and subsequently worked at several local restaurants. In spite of his disabilities, while in pretrial detention he successfully completed a variety of educational and counseling programs and obtained a high school diploma.

{4}      At a hearing on his motion for release on nonmonetary conditions, Defendant presented testimony from Dr. James Harrington, a psychologist with the district court's pretrial services program who had interviewed and evaluated Defendant to determine whether he would be an appropriate candidate for supervised pretrial release. Dr. Harrington characterized Defendant as compliant, cooperative, and honest during the interview. Dr. Harrington concluded that Defendant exhibits none of the factors typically correlated with dangerousness or a risk of flight, such as prior criminal history or a history of mental illness or substance abuse. Dr. Harrington also

verified that Defendant has the capacity to understand and comply with the proposed conditions of supervised release. Based on his evaluation, Dr. Harrington opined that Defendant was an appropriate candidate for release under the supervision of the pretrial services program with GPS monitoring.

{5}     The State declined to cross-examine Dr. Harrington or to present any evidence of its own. Instead, the State simply argued that the $250,000 bond should remain in place due to the serious nature of the criminal charges against Defendant. In support of its argument, the State proffered an undisputed account of the factual circumstances underlying the charges. On the day of the alleged homicide while she was highly intoxicated, Defendant's acquaintance Rebecca Duran got into an altercation with several people at a house. Before leaving the house, Duran threatened to come back and "get even" with the people there. After leaving, Duran sought out Defendant and an acquaintance named Eugene Helfer and asked them to accompany her back to the house, where neither Duran nor Helfer nor Defendant lived, to retrieve Duran's personal belongings. Neither Defendant nor Helfer had been present during the earlier altercation.

{6}     When Duran returned to the house with Defendant and Helfer, they knocked on the front door; when there was no answer, they went around to the back of the

4

house and entered by opening a sliding glass door. Once inside, Duran attacked several people and hit the victim in the head with a wrench. As explained by the State, Duran was "the one mostly arguing" and "starting stuff." At some point the victim pushed Helfer, who is Defendant's friend. Defendant reacted by stabbing the victim once with a folding pocket knife, fatally piercing the victim's heart.

{7}     After hearing from Defendant and the State, the district court orally denied Defendant's motion for release on nonmonetary conditions on the ground that Defendant's charge of first-degree felony murder carried a possible life sentence that would require at least thirty years of imprisonment. The district court subsequently filed a written order setting forth detailed factual findings. Based on the evidence presented at the motion hearing, the district court found that the pretrial services program could fashion appropriate conditions of release for Defendant and that Defendant could live with his father and return to his former job if released. The district court also found that Defendant's IQ is 70, that Defendant has longstanding ties in the community, and that Defendant has the support of both of his parents. The district court's findings included Dr. Harrington's conclusions that Defendant has no alcohol or substance abuse issues and no pending criminal proceedings or history of violence outside the allegations in this case. The district court found that Defendant

5

had "been entirely compliant for the entirety of his pretrial incarceration of over 2 years and 4 months" and had "appeared timely and without incident at all scheduled hearings in this case." The district court called its findings "uncontroverted." And the district court explicitly found that the State had presented no information indicating that Defendant would commit new crimes, pose a danger to anyone, or fail to appear in court if released from custody. Despite these findings, the district court kept Defendant's $250,000 bond in place due to "the nature and seriousness of the alleged offense."

{8}     After several more months of pretrial confinement, Defendant filed a second motion, again seeking release under the supervision of the pretrial services program with appropriate nonmonetary release conditions. At a hearing on the second motion, defense counsel reiterated the information presented at the first hearing five months earlier and argued that Defendant's unique personal history made him likely to comply with conditions of release and unlikely to commit additional crimes while released. Dr. Harrington testified again that he deemed Defendant to be a good candidate for nonmonetary pretrial release. Defendant also presented the testimony of Patrick Wojtowicz, the pretrial services officer likely to supervise Defendant if released. Mr. Wojtowicz verified that Defendant could live with his father and return

6

to work if released. Mr. Wojtowicz confirmed that Defendant would be capable of using public transportation to get to the pretrial services office for appointments. And Mr. Wojtowicz agreed with Dr. Harrington that pretrial release with GPS monitoring and supervision by the pretrial services program would be a good fit for Defendant. Without specifically controverting the evidence presented at the hearing, the State argued against any change to Defendant's conditions of release on the theory that the seriousness of the charges alone justified the requirement of a $250,000 bond for release pending trial.

{9}     After hearing from the parties, the district court judge admitted that he was "absolutely impressed" with Defendant's presentation but "hesitant to act upon it." The district court orally denied Defendant's second motion to amend the conditions of pretrial release. Defense counsel asked the district court judge to clarify the reasons for his decision. The judge explained that the nature of the allegations and the potential sentence led the judge to believe that releasing Defendant "may present a danger of either flight or to other members of the community." The district court did not file a written order disposing of the second motion.

{10}     After the district court denied Defendant's second motion to amend the conditions of release, Defendant appealed to the Court of Appeals by filing a motion

7

under Rule 12-204 NMRA, which provides the procedure for appealing a district court's pretrial release order. Defendant asked the Court of Appeals to reverse the pretrial release order and to enter an order setting appropriate conditions of release. The Court of Appeals transferred the appeal to this Court, which has exclusive appellate jurisdiction over cases involving potential sentences of life imprisonment. *See State v. Smallwood*, 2007-NMSC-005, ¶ 11, 141 N.M. 178, 152 P.3d 821 (holding that "the legislature intended for [the Supreme Court] to have jurisdiction over interlocutory appeals in situations where a defendant may possibly be sentenced to life imprisonment or death").

{11} After hearing oral arguments from the parties, this Court filed an order (1) accepting the transfer from the Court of Appeals, (2) reversing the district court's pretrial release order, and (3) remanding this case to the district court to set appropriate nonmonetary conditions of release, including GPS monitoring and supervision by the district court's pretrial services program.

**II. DISCUSSION**

**A. This Court Has Exclusive Jurisdiction over Defendant's Appeal Because He Faces a Possible Sentence of Life Imprisonment**

{12} As a preliminary matter we consider whether Defendant's appeal should be heard by this Court or by the Court of Appeals. The extent of this Court's appellate

jurisdiction is a question of law that we review de novo. *See Lion's Gate Water v. D'Antonio*, 2009-NMSC-057, ¶ 18, 147 N.M. 523, 226 P.3d 622.

{13} Article VI, Section 2 of the New Mexico Constitution gives this Court exclusive appellate jurisdiction over appeals from final district court judgments "imposing a sentence of death or life imprisonment" as well as jurisdiction over other appeals "as may be provided by law." In this case, Defendant appeals from an interlocutory pretrial release order, not a final judgment. *See Tijerina v. Baker*, 1968-NMSC-009, ¶ 8, 78 N.M. 770, 438 P.2d 514 (per curiam) (concluding that a pretrial release order is interlocutory); *State v. David*, 1984-NMCA-119, ¶ 13, 102 N.M. 138, 692 P.2d 524 (explaining that an "interlocutory bail determination is not a final judgment").

{14} Defendant's right to file this interlocutory appeal arises under NMSA 1978, Section 39-3-3(A)(2) (1972), which permits an appeal from a district court "order denying relief on a petition to review conditions of [pretrial] release." We have held that Section 39-3-3(A), in conjunction with Article VI, Section 2 of the New Mexico Constitution, gives this Court exclusive appellate jurisdiction over interlocutory appeals in criminal cases where the defendant faces a possible sentence of life imprisonment or death. *See Smallwood*, 2007-NMSC-005, ¶¶ 6-11. In *Smallwood*, we

identified Section 39-3-3 as "the one statute dealing specifically with appellate jurisdiction over interlocutory appeals in criminal cases" and noted that the statute permits a defendant to appeal to either "'the supreme court or court of appeals, as appellate jurisdiction may be vested by law in these courts.'" *Smallwood*, 2007-NMSC-005, ¶ 9 (quoting Section 39-3-3(A)). Because the New Mexico Constitution vests this Court with exclusive appellate jurisdiction over final district court judgments imposing a sentence of life imprisonment or death, we concluded that Section 39-3-3(A) confers "this Court with jurisdiction over a criminal defendant's interlocutory appeal in cases where a sentence of life imprisonment or death *could be* imposed." *Smallwood*, 2007-NMSC-005, ¶ 10.

{15} In this case, Defendant is charged with first-degree felony murder, an offense that carries a possible sentence of life imprisonment. *See* NMSA 1978, § 30-2-1(A) (1994); NMSA 1978, § 31-18-14 (2009). We therefore hold that this Court has exclusive appellate jurisdiction to consider Defendant's appeal.

{16} Although this Court has exclusive appellate jurisdiction to hear Defendant's appeal, Defendant filed his appeal in the Court of Appeals. It appears that an inadvertent omission in our procedural rules may have caused Defendant's error. Under Rule 5-401(G), a person who has been unable "to meet the bail set[] shall,

10

upon motion, be entitled to have a hearing to review the amount of bail set."[1] And if a person "continues to be detained" after such a hearing "because of a failure to meet a condition imposed," then that person may appeal "to the *Supreme Court or Court of Appeals*, as jurisdiction may be vested by law, in accordance with the Rules of Appellate Procedure." Rule 5-405(A) NMRA (emphasis added).

{17}    And although Rule 5-405(A) recognizes this Court's appellate jurisdiction to review certain pretrial release orders, Rule 12-204 NMRA of the Rules of Appellate Procedure instructs litigants to initiate such appeals by filing a motion in the Court of Appeals. *See* Rule 12-204(A) ("An appeal provided for by NMSA 1978, § 39-3-3A(2), and Rule 5-405 of the Rules of Criminal Procedure shall be taken by filing a motion with the clerk of *the court of appeals* within ten (10) days after the decision of the district court and serving a copy on the district attorney and the appellate division of the attorney general." (emphasis added)). We conclude that Rule 12-204 should be amended to reflect this Court's exclusive jurisdiction over interlocutory appeals from pretrial release orders in cases where the defendant faces

---

[1]The term "bail" as used in this opinion may refer to either (1) the "process by which a person is released from custody either on the undertaking of a surety or on his or her own recognizance" or (2) the "security such as cash, a bond, or property" that a person must provide in order to gain such release. Black's Law Dictionary 167 (10th ed. 2014).

11

a possible sentence of life imprisonment or death, and we ask our Rules of Appellate Procedure Committee to draft proposed rule amendments for this Court's consideration.

**B.      The District Court Failed to Impose the Least Restrictive Conditions of Release That Would Reasonably Assure Defendant's Appearance in Court and the Safety of the Community**

{18}      We now turn to the merits of Defendant's appeal. Defendant argues that the district court erred by disregarding the undisputed evidence concerning his suitability for pretrial release and by basing its pretrial release order solely on the nature of the charges, excluding consideration of other factors that the district court must consider under Rule 5-401(C) of the Rules of Criminal Procedure for the District Courts. The State has maintained that a $250,000 bond is justified by the nature and seriousness of the charges in this case. In order to fully explain why we set aside the district court's pretrial release order in this case, we begin with an abbreviated review of the origins and history of bail and an examination of the bail provisions in the New Mexico Constitution and our rules of criminal procedure.

**1.      Constitutional Right to Bail in New Mexico**

{19}      The New Mexico Constitution affords criminal defendants a right to bail in Article II, Section 13, which provides that "[a]ll persons shall, before conviction be

bailable by sufficient sureties" and that "[e]xcessive bail shall not be required." These provisions were first incorporated into the written law of territorial New Mexico when Brigadier General Stephen Kearny promulgated the Kearny Bill of Rights in 1846. *See Kearny Bill of Rights*, cl. 9 (1846, reprinted in Vol. 1 of NMSA 1978) ("[A]ll persons shall be bailed by sufficient sureties, except in capital offenses where proof of guilt is evident."); *Kearny Bill of Rights*, cl. 10 ("[E]xcessive bail shall not be required."). Article II, Section 13 enshrines the principle that a person accused of a crime is entitled to retain personal freedom "until adjudged guilty by the court of last resort." *Tijerina*, 1968-NMSC-009, ¶ 9; *see Bandy v. United States*, 81 S. Ct. 197, 197 (1960) ("The fundamental tradition in this country is that one charged with a crime is not, in ordinary circumstances, imprisoned until after a judgment of guilt.").

{20}     Notwithstanding the presumption that all persons are bailable pending trial, the right to bail "is not absolute under all circumstances." *Tijerina*, 1968-NMSC-009, ¶ 9. Article II, Section 13 contains two exceptions that restrict the right to bail as to certain persons. First, the district court may deny bail altogether to a person charged with a capital offense if "the proof is evident or the presumption great." N.M. Const. art. II, § 13. Second, the district court may deny bail

> for a period of sixty days after the incarceration of the defendant by an
> order entered within seven days after the incarceration, in the following

13

instances:

  A. the defendant is accused of a felony and has previously been convicted of two or more felonies, within the state, which felonies did not arise from the same transaction or a common transaction with the case at bar;

  B. the defendant is accused of a felony involving the use of a deadly weapon and has a prior felony conviction, within the state. The period for incarceration without bail may be extended by any period of time by which trial is delayed by a motion for a continuance made by or on behalf of the defendant.

*Id.* A court cannot refuse to set bail and detain a defendant pending trial under either of these exceptions without first providing the defendant with adequate procedural due process protections, including the right to counsel, notice, and an opportunity to be heard. *See David*, 1984-NMCA-119, ¶ 23 (citing *Tijerina*, 1968-NMSC-009).

{21} Once released, a defendant's continuing right to pretrial liberty is conditioned on the defendant's appearance in court, compliance with the law, and adherence to the conditions of pretrial release imposed by the court. *See* Rule 5-403(A) NMRA (providing that the court may revoke release "upon a showing that the defendant has been indicted or bound over for trial on a charge constituting a serious crime allegedly committed while released pending adjudication of a prior charge"); *State v. Segura*, 2014-NMCA-037, ¶ 8, 321 P.3d 140 (explaining that the court may revoke bail to ensure "the proper administration of justice" or "for violation of a condition of pretrial release" (internal quotation marks and citation omitted)). Accordingly, if

14

a defendant fails to appear in court, commits additional crimes, or violates conditions of pretrial release, the court may, upon notice and hearing, revoke the defendant's release and remand the defendant into custody. *See Tijerina*, 1968-NMSC-009, ¶ 11 (noting that due process requires "notice and an opportunity to be heard before bond can be revoked and a defendant remanded to custody"); *Segura*, 2014-NMCA-037, ¶ 23 (concluding that the state has the burden of establishing facts to support a revocation of bail and that the defendant has a due process right to contest the state's evidence). *But cf. State v. Romero*, 2006-NMCA-126, ¶¶ 1-2, 140 N.M. 524, 143 P.3d 763 (holding that a bail bond may be forfeited for failure to appear but not for violation of other conditions of release), *aff'd*, 2007-NMSC-030, ¶ 6, 141 N.M. 733, 160 P.3d 914. Under all other circumstances, the New Mexico Constitution requires that "[a]ll persons shall . . . be bailable by sufficient sureties" and that "[e]xcessive bail shall not be required." N.M. Const. art. II, § 13.

**2.     Origins and History of Bail in England**

{22}     The right to pretrial release set forth in the New Mexico Constitution has roots that extend back to medieval England, where bail originated "as a device to free untried prisoners." Daniel J. Freed & Patricia M. Wald, *Bail in the United States: 1964* 1 (1964); *see* IV William Blackstone, *Commentaries on the Laws of England*

*in Four Books* 1690 (Rees Welsh & Co. 1902) (1769) ("By the ancient common law, before and since the [Norman] conquest, all felonies were bailable, till murder was excepted by statute; so that persons might be admitted to bail before conviction almost in every case." (footnotes omitted)). *See generally* William F. Duker, *The Right to Bail: A Historical Inquiry*, 42 Alb. L. Rev. 33, 34-66 (1977) (describing the origins and history of bail in England); Elsa de Haas, *Antiquities of Bail* 128 (1940) (concluding that the "root idea of the modern right to bail" came from "tribal custom on the continent of Europe").

{23}    During the Anglo-Saxon period in England before the Norman conquest, the penalty for most crimes was a monetary fine paid as compensation to the victim. *See* June Carbone, *Seeing Through the Emperor's New Clothes: Rediscovery of Basic Principles in the Administration of Bail*, 34 Syracuse L. Rev. 517, 519-20 (1983). Under this system of justice, the sheriff often required the accused to secure a third party, or surety, to guarantee the appearance of the accused for trial and the payment of the fine upon conviction. *See id.* at 520; *see also Bail: An Ancient Practice Reexamined*, 70 Yale L.J. 966, 966 (1961). The amount of money pledged as bail was identical to the penalty prospect upon a conviction, and the surety was required to pay the fine if the accused failed to appear for trial. Carbone, *supra*, at 520. This system

of bail ensured victim compensation and deterred pretrial flight because the surety bore financial responsibility for payment of the penalty and had an incentive to produce the accused for trial. *Id.*

{24} Following the Norman conquest of 1066, capital and corporal punishment began gradually to replace monetary fines as the penalty for most offenses, and accused persons faced longer delays between accusation and trial as they waited for traveling judges to arrive and dispense local justice. *See id.* at 519, 521; *see also* Freed & Wald, *supra*, at 1 ("Disease-ridden jails and delayed trials by traveling justices necessitated an alternative to holding accused persons in pretrial custody."). The development of corporal and capital punishment complicated the use of bail because the amount of money pledged no longer correlated directly to the potential punishment. Carbone, *supra*, at 522. The endowment of local sheriffs with discretion in setting bail led to rampant corruption and abuse. *See United States v. Edwards*, 430 A.2d 1321, 1326 (D.C. Cir. 1981) (en banc) (explaining that sheriffs "exercised a broad and ill-defined discretionary power to bail" prisoners and that this "power was widely abused by sheriffs who extorted money from individuals entitled to release without charge" and who "accepted bribes from those who were not otherwise entitled to bail").

{25} In response to historical abuses, the common law right to bail was codified into written English law. In 1215, the principles that an accused is presumed innocent and entitled to personal liberty pending trial were incorporated into the Magna Carta, which proclaimed that "no freeman shall be taken or imprisoned . . . [except by] the judgment of his peers or by the law of the land." *Kennedy v. Mendoza-Martinez*, 372 U.S. 144, 186 (1963) (internal quotation marks and citation omitted). In 1275, the English Parliament enacted the Statute of Westminster, which defined bailable offenses and provided criteria for determining whether a particular person should be released, including the strength of the evidence against the accused and the accused's criminal history. *See Bail: An Ancient Practice Reexamined*, *supra*, at 966; Carbone, *supra*, at 523-26. In 1679, Parliament adopted the Habeas Corpus Act to ensure that an accused could obtain a timely bail hearing; and in 1689, Parliament enacted an English Bill of Rights that prohibited excessive bail. *See* Carbone, *supra*, at 528. In crossing the Atlantic, American colonists carried concepts embedded in these documents that became the foundation for our current system of bail. *See id.* at 529.

**3.     Bail in the United States**

{26} The presumption that defendants should be released pending trial became widely adopted throughout the United States in both the state and federal systems. *See*

18

*Bail: An Ancient Practice Reexamined*, *supra*, at 967. One commentator who surveyed the bail laws in each of the states found that forty-eight states have protected, by constitution or statute, a right to bail "by sufficient sureties, except for capital offenses when the proof is evident or the presumption great." Matthew J. Hegreness, *America's Fundamental and Vanishing Right to Bail*, 55 Ariz. L. Rev. 909, 916 (2013). States modeled these provisions on the Pennsylvania Constitution of 1682, which provided that "'all Prisoners shall be Bailable by Sufficient Sureties, unless for capital Offenses, where proof is evident or the presumption great.'" *See* Carbone, *supra*, at 531-32 ("[T]he Pennsylvania provision became the model for almost every state constitution adopted after 1776.").

{27}     At the federal level, the first United States Congress established a statutory right to bail by enacting the Judiciary Act of 1789, which provided an absolute right to bail in noncapital cases and bail at the discretion of the judge in capital cases. *See* Judiciary Act of 1789, ch. 20, § 33, 1 Stat. 73, 91; *see also* Caleb Foote, *The Coming Constitutional Crisis in Bail: I*, 113 U. Pa. L. Rev. 959, 971 (1965) (explaining that the "bail problem" was before the first Congress in the spring and summer of 1789). The first Congress also proposed that the states adopt the Eighth Amendment to the United States Constitution, which, like the New Mexico Constitution and English Bill

of Rights, prohibits excessive bail. *See* U.S. Const. amend. VIII; N.M. Const. art. II, § 13; *see also Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 294 (1989) (O'Connor, J., concurring in part and dissenting in part) (explaining that the first Congress based the Eighth Amendment "on Article I, § 9, of the Virginia Declaration of Rights of 1776, which had in turn adopted verbatim the language of § 10 of the English Bill of Rights"). But unlike the New Mexico Constitution, the United States Constitution does not contain an explicit right to bail clause and guarantees only that "[e]xcessive bail shall not be required." U.S. Const. amend. VIII; *see Carlson v. Landon*, 342 U.S. 524, 545-46 (1952) (explaining that the United States Constitution can be construed only as a prohibition against excessive bail in those cases in which it is proper to grant bail because the Eighth Amendment does not provide a "right to bail"). The United States Supreme Court has held that "[b]ail set at a figure higher than an amount reasonably calculated to fulfill [the] purpose [of adequately assuring the presence of the accused] is 'excessive' under the Eighth Amendment." *Stack v. Boyle*, 342 U.S. 1, 5 (1951). As the Court explained,

> From the passage of the Judiciary Act of 1789, 1 Stat. 73, 91, to the present Federal Rules of Criminal Procedure, Rule 46(a)(1), 18 U.S.C.A., federal law has unequivocally provided that a person arrested for a non-capital offense shall be admitted to bail. This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to

conviction. See Hudson v. Parker, 1895, 156 U.S. 277, 285 . . . . Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning.

*Id.* at 4.

{28} Despite the ancient origins and broad recognition of the right to bail in this country, studies of the administration of bail in the twentieth century raised a number of concerns about its widespread misuse. *See* Field Study, *A Study of the Administration of Bail in New York City*, 106 U. Pa. L. Rev. 693 (1958); Note, *Compelling Appearance in Court: The Administration of Bail in Philadelphia*, 102 U. Pa. L. Rev. 1031 (1954); Arthur L. Beeley, *The Bail System in Chicago* (1927). *See generally* Wayne H. Thomas, Jr., *Bail Reform in America* 3-19 (1976); Ronald Goldfarb, *Ransom* (1965); Foote, *supra*; Freed & Wald, *supra*, at 9-21. The studies all concluded that the system of money bail in the United States discriminates against indigent defendants who lack the financial resources to post bail. *See, e.g.*, Thomas, *supra*, at 11, 19 ("The American system of bail allows a person arrested for a criminal offense the right to purchase his release pending trial. Those who can afford the price are released; those who cannot remain in jail. . . . The requirement that virtually every defendant must post bail causes discrimination against defendants who are poor."). Researchers also found that defendants incarcerated pending trial were held "under

harsher conditions than those applied to convicted prisoners," even though many of those defendants ultimately were either acquitted or given no sentence of imprisonment upon the disposition of their cases. Foote, *supra*, at 960.

{29} These concerns were accompanied by criticism of the growing role commercial bail bond agents played in determining whether defendants would be released pending trial. *See* Notes, *Preventive Detention Before Trial*, 79 Harv. L. Rev. 1489, 1490 (1966). No commercial bail bond industry existed in medieval England, where pretrial release was conditioned upon the accused securing a reputable friend or relative to personally assure the accused's appearance for trial. *See* Thomas, *supra*, at 11-12; *see also* F.E. Devine, *Commercial Bail Bonding* 5 (1991) (explaining that sureties in eighteenth-century England "were viewed as actively exercising a friendly custody of the accused"). To the contrary, the English judicial system has always found the concept of commercial sureties repugnant. *See generally* Devine, *supra*, at 37 (explaining that, in the nineteenth century, the English common law treated an agreement to pay a surety for bail as an "unenforceable illegal contract contrary to the public interest" and, in the twentieth century, as a "crime of conspiracy to effect a public mischief" or a crime of "conspiracy to obstruct the court of justice"); *id.* at 45 (explaining that the English Bail Act of 1976 sets forth criminal penalties for agreeing

22

to indemnify a surety in a criminal proceeding, effectively barring any commercial bail bond industry). England is not alone in its rejection of the commercial bail bond industry. "Viewed from an international perspective, the commercial bail bonding system has provoked an almost universally unfavorable reaction" in common law judicial systems, and "only one country, the Philippines, has adopted a commercial bail bonding system similar to the American system." *Id.* at 15.

{30}    Contrary to this international trend, a commercial bail bond industry emerged in the early United States. Contributing factors included the near-absolute right to bail set forth in the Judiciary Act of 1789 and in most state constitutions, the unavailability of friends and relatives who might serve as personal sureties, and the ability of defendants to flee into the vast American frontier. *See Thomas*, *supra*, at 11-12. By the middle of the twentieth century in the United States, commercial bail bond companies who charged defendants a nonrefundable fee for their services, typically ten percent of the bond amount, frequently posted money bail. *See id.* at 11; Freed & Wald, *supra*, at 22-24.

{31}    A commercial bail bond may enable a defendant to post money bail required by the court as additional assurance that the defendant will appear for trial. *See Stack v. Boyle*, 342 U.S. at 5 ("Like the ancient practice of securing the oaths of responsible

persons to stand as sureties for the accused, the modern practice of requiring a bail bond or the deposit of a sum of money subject to forfeiture serves as additional assurance of the presence of an accused."). But critics argued that the commercial bail bond industry inappropriately delegated to private agents the power to determine which defendants get released. *See Preventive Detention Before Trial*, *supra*, at 1490. As one federal judge observed, the effect of the commercial bail bond industry

> is that the professional bondsmen hold the keys to the jail in their pockets. They determine for whom they will act as surety—who in their judgment is a good risk. The bad risks, in the bondsmen's judgment, and the ones who are unable to pay the bondsmen's fees, remain in jail. The court [is] relegated to the relatively unimportant chore of fixing the amount of bail.

*Pannell v. United States*, 320 F.2d 698, 699 (D.C. Cir. 1963) (Wright, J., concurring).

{32} Some fifty years ago, widespread concerns about problems and inequities in bail practices sparked national interest in establishing new bail procedures and pretrial programs that would treat the rich and the poor more equitably by facilitating pretrial release without the requirement of monetary bonds. The modern bail reform movement began with the Manhattan Bail Project, conducted in the 1960s by the Vera Foundation in New York City. *See* Thomas, *supra*, at 3, 20-27; Goldfarb, *supra*, at 150-72. Through the Manhattan Bail Project, defendants were interviewed prior to their first appearance in court to evaluate whether they were good candidates for

24

pretrial release on recognizance; that is, release "on one's honor pending trial." Goldfarb, *supra*, at 153-54. The standard interview questions included an inquiry into a defendant's personal background, community ties, and criminal history. *Id.* The interviewer scored a defendant's answers using a point-weighing system and verified answers for accuracy, usually over the telephone with references the defendant provided. *Id.* at 154-55, 174-75. The interviewers gave the resulting information to the court and made recommendations regarding which defendants should be released on recognizance. *Id.* at 155. The Manhattan Bail Project proved successful. During the first three years of the experiment, defendants released on recognizance at the recommendation of the Vera Foundation were about three times more likely to appear for trial than defendants in control groups deemed eligible for release on recognizance who instead were released on money bail. *Id.* at 155, 157. The Manhattan Bail Project "showed that defendants could be successfully released pretrial without the financial guarantee of a surety bail agent if verified information concerning their stability and community ties were presented to the court." Thomas H. Cohen & Brian A. Reaves, *Pretrial Release of Felony Defendants in State Courts* 4 (U.S. Dep't of Justice Nov. 2007). The success of the Manhattan Bail Project increased national interest in bail reform and triggered the creation of pretrial services

programs across the country. *See* Timothy R. Schnacke et al., Pretrial Justice Inst., *The History of Bail and Pretrial Release* 10 (2010); *see also* Marie VanNostrand et al., *Our Journey Toward Pretrial Justice*, 71 Fed. Probation, no. 2, 2007, 20, 20 (discussing pretrial services agencies "as providers of the information necessary for judicial officers to make the most appropriate bail decision" and to "provide monitoring and supervision of defendants released with conditions pending trial").

{33}     Driven by the same concerns that inspired the Manhattan Bail Project, Congress enacted the Bail Reform Act of 1966, the first major reform of the federal bail system since the Judiciary Act of 1789. *See* Bail Reform Act of 1966, Pub. L. No. 89-465, 80 Stat. 214 (repealed 1984). The stated purpose of the Bail Reform Act of 1966 was "to assure that all persons, regardless of their financial status, shall not needlessly be detained pending their appearance to answer charges . . . when detention serves neither the ends of justice nor the public interest." *Id.* Sec. 2. The Act included the following key provisions to govern pretrial release in noncapital criminal cases in federal court: (1) a presumption of release on personal recognizance unless the court determined that such release would not reasonably assure the defendant's appearance in court, (2) the option of conditional pretrial release under supervision or other terms designed to decrease the risk of flight, and (3) a prohibition on the use

of money bail in cases where nonfinancial release options such as supervisory custody or restrictions on "travel . . . or place of abode" are sufficient to reasonably assure the defendant's appearance. *See id.* Sec. 3, § 3146(a); *see also* VanNostrand et al., *supra*, at 20 (explaining that the 1966 Act "established a presumption of release by the least restrictive conditions, with an emphasis on non-monetary terms of bail"). By emphasizing nonmonetary terms of bail, Congress attempted to remediate the array of negative impacts experienced by defendants who were unable to pay for their pretrial release, including the adverse effect on defendants' ability to consult with counsel and prepare a defense, the financial impacts on their families, a statistically less-favorable outcome at trial and sentencing, and the fiscal burden that pretrial incarceration imposes on society at large. *See* H.R. Rep. No. 89-1541 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2293, 2299.

{34}    Congress again revised federal bail procedures with the Bail Reform Act of 1984, enacted as part of the Comprehensive Crime Control Act of 1984. *See* Bail Reform Act of 1984, Pub. L. No. 98-473, § 202, 98 Stat. 1837, 1976 (codified at 18 U.S.C. §§ 3141-3150 (2012)). The legislative history of the 1984 Act explains that Congress wanted to "address the alarming problem of crimes committed by persons on release" and to "give the courts adequate authority to make release decisions that

give appropriate recognition to the danger a person may pose to others if released." S. Rep. 98-225, at 3 (1983), *reprinted in* 1984 U.S.C.C.A.N. 3182, 3185. The 1984 Act, as amended, retains many of the key provisions of the 1966 Act but "allows a federal court to detain an arrestee pending trial if the Government demonstrates by clear and convincing evidence after an adversary hearing that no release conditions 'will reasonably assure . . . the safety of any other person and the community.'" *United States v. Salerno*, 481 U.S. 739, 741 (1987) (omission in original) (quoting the Bail Reform Act of 1984) (upholding the preventive detention provisions in the 1984 Act); *see also* 18 U.S.C. § 3142(a) (providing generally the current federal procedure for ordering either release or detention of a defendant pending trial), *held unconstitutional on other grounds by, e.g., United States v. Karper*, 847 F. Supp. 2d 350 (N.D.N.Y. 2011).

{35} Twentieth-century advances in pretrial justice notwithstanding, the administration of bail in the United States remains problematic. *See* John S. Goldkamp, *Judicial Responsibility for Pretrial Release Decisionmaking and the Information Role of Pretrial Services*, 57 Fed. Probation 28, 30 (1993) ("Even after decades of bail reform, serious questions about the fairness and effectiveness of pretrial release in the United States have not been resolved."). A recent United States

Department of Justice report, which provides statistics about state court felony defendants in the nation's seventy-five largest counties between 1990 and 2004, reflects some of the enduring inequalities in our nation's system of bail. *See* Cohen & Reaves, *supra*. The report demonstrates that, in the last two decades, states have again increased their reliance on commercial surety bonds while decreasing the use of personal recognizance releases. *See id.* at 1-2 ("Beginning in 1998, financial pretrial releases, requiring the posting of bail, were more prevalent than non-financial releases."). As a result, the number of pretrial inmates in jail populations has grown "at a much faster pace than sentenced inmates, despite falling crime rates." Kristin Bechtel et al., Pretrial Justice Inst., *Dispelling the Myths: What Policy Makers Need to Know About Pretrial Research* 1-2 (Nov. 2012). Most of the defendants who remain in custody pending trial stay in jail because they cannot afford the bail set by the court, not because they have been denied bail altogether. *See* Cohen & Reaves, *supra*, at 1 ("Among [felony] defendants detained until case disposition, 1 in 6 had been denied bail and 5 in 6 had bail set with financial conditions required for release that were not met."). "Hispanics were less likely than non-Hispanic defendants to be released, and males were less likely than females to be released." *Id.* Twenty percent of these detained defendants "eventually had their case dismissed or were acquitted,"

29

so many of them could have avoided imprisonment altogether if only they had the resources to post bail. *Id.* at 7.

{36} To address the persistent inequities and inefficiencies in our current administration of bail, a number of national entities have promulgated standards and best practices for pretrial release programs. *See, e.g.*, Am. Bar Ass'n, *ABA Standards for Criminal Justice: Pretrial Release* (3d ed. 2007) (hereinafter *ABA Standards*); Nat'l Ass'n of Pretrial Servs. Agencies, *Standards on Pretrial Release* (3d ed. 2004) [hereinafter *NAPSA Standards*]; Nat'l Dist. Attorneys Ass'n, *National Prosecution Standards*, Standards 4-4.1 to 4-4.5, at 56-57 (3d ed. 2009). Renewed interest in pretrial justice has led some commentators to suggest that the criminal justice system in the United States has begun to experience a new wave of bail reform in the twenty-first century. *See* Bechtel et al., *supra*, at 2 n.1; Schnacke et al., *supra*, at 21-27 (noting that "jurisdictions across the United States have become significantly more interested in the topic of bail and pretrial release").

**4.      The New Mexico Pretrial Release Rules**

{37} The New Mexico Rules of Criminal Procedure provide the mechanism through which a person may effectuate the right to pretrial release afforded by Article II, Section 13 of the New Mexico Constitution. *See* Rule 5-401 (providing procedures

30

for district courts); Rule 6-401 NMRA (providing procedures for magistrate courts); Rule 7-401 NMRA (providing procedures for metropolitan court); Rule 8-401 NMRA (providing procedures for municipal courts). New Mexico modeled its bail rules, which were first adopted in 1972, on the federal Bail Reform Act of 1966. *See* NMSA 1978, Crim. P. Rule 22 (Repl. Pamp. 1980; including the May 1972 New Mexico Supreme Court order); *see also* Committee commentary to Rule 5-401 (explaining that the rule is modeled on the Bail Reform Act of 1966). Like the Bail Reform Act of 1966, the New Mexico bail rules establish a presumption of release by the least restrictive conditions and emphasize methods of pretrial release that do not require financial security. *See* Rule 5-401(A); *State v. Gutierrez*, 2006-NMCA-090, ¶ 17, 140 N.M. 157, 140 P.3d 1106 (recognizing "that the purpose of the Federal Bail Reform Act of 1966, from which our rule is derived, was to encourage more releases on personal recognizance").

{38}     Originally, the only valid purpose of bail in New Mexico was to ensure the defendant's appearance in court. *See* Crim. P. Rule 22(a) (requiring the judge to make a pretrial release decision that would "reasonably assure the appearance of the person as required"); *see also State v. Eriksons*, 1987-NMSC-108, ¶ 6, 106 N.M. 567, 746 P.2d 1099 ("[T]he purpose of bail is to secure the defendant's attendance to submit

31

to the punishment to be imposed by the court."). To further incentivize appearance in court, in the early 1970s the Legislature granted courts statutory authority to order forfeiture of bail upon a defendant's failure to appear, *see* NMSA 1978, § 31-3-2(B)(2) (1972, as amended through 1993), and enacted separate criminal penalties for failure to appear, *see* NMSA 1978, § 31-3-9 (1973, as amended through 1999). Following recognition in the federal Bail Reform Act of 1984 that public safety is a valid consideration in pretrial release decisions, this Court amended our rules to require judges to consider not only the defendant's flight risk but also the potential danger that might be posed by the defendant's release to the community in determining which conditions of release should be fashioned. *See* Rule 5-401 NMRA (1990) (prescribing that judges consider "the appearance of the person as required" and "the safety of any other person and the community").

{39}     If a person is bailable under Article II, Section 13 of the New Mexico Constitution, our rules of criminal procedure require the trial court to set the least restrictive of the bail options and release conditions that "will reasonably assure appearance of the person as required" and "the safety of any other person and the community." Rule 5-401(A)-(D). In doing so, the court must evaluate the available information about the defendant and the extent of the flight risk and safety concerns

32

posed by the defendant. To guide the courts in accomplishing this task, the rule provides a list of factors that the court must take into account:

> (1)   the nature and circumstances of the offense charged, including whether the offense is a crime of violence or involves a narcotic drug;
> (2)   the weight of the evidence against the person;
> (3)   the history and characteristics of the person, including:
> > (a)   the person's character and physical and mental condition;
> > (b)   the person's family ties;
> > (c)   the person's employment status, employment history and financial resources;
> > (d)   the person's past and present residences;
> > (e)   the length of residence in the community;
> > (f)   any facts tending to indicate that the person has strong ties to the community;
> > (g)   any facts indicating the possibility that the person will commit new crimes if released;
> > (h)   the person's past conduct, history relating to drug or alcohol abuse, criminal history and record concerning appearance at court proceedings; and
> > (i)   whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal or completion of an offense under federal, state or local law;
> (4)   the nature and seriousness of the danger to any person or the community that would be posed by the person's release; and
> (5)   any other facts tending to indicate the person is likely to appear.

Rule 5-401(C).

{40}   Rule 5-401 prioritizes five increasingly exacting bail options pending trial: (1)

33

release on the defendant's personal recognizance; (2) release upon the execution of an unsecured appearance bond; (3) release upon the execution of an appearance bond accompanied by a cash deposit to the court of a specified percentage of the total amount set for bail; (4) release upon the execution of a bond secured by property belonging to either the defendant or an unpaid surety; and (5) release upon either execution of a bond by a licensed bail bond agent or execution of an appearance bond by the defendant accompanied by a cash deposit of one hundred percent of the amount set for bail. *See* Rule 5-401(A)-(B). The trial court must consider this hierarchy of release options in the order set forth in the rule, beginning with the least restrictive option. *Id.*; *see Gutierrez*, 2006-NMCA-090, ¶¶ 9-10 (specifying that the options "'are set forth in the order of priority [in which] they are to be considered by the judge'" (quoting Rule 5-401 Committee commentary)). Whenever possible, the court should dispense with the requirement of any financial security and should release the defendant either on the defendant's "personal recognizance or upon the execution of an unsecured appearance bond in an amount set by the court." Rule 5-401(A). But if the court makes specific written findings demonstrating that nonfinancial release options "will not reasonably assure the appearance of the person as required or will endanger the safety of any other person or the community," the

34

court may require the defendant to execute one of the types of secured bonds enumerated in the rule. Rule 5-401(B).

{41} In addition to choosing an appropriate bail option, the trial court should consider whether to impose additional nonmonetary conditions to limit and monitor the defendant's conduct while released pending trial. *See* Rule 5-401(D). The court may condition the defendant's continued pretrial release on refraining from further criminal conduct while awaiting trial. *See* Rule 5-401(D)(1). Rule 5-401(D)(2) sets forth a range of other potential conditions that the court may consider and instructs the court to order the least restrictive condition or combination of conditions that "will reasonably assure the appearance of the person as required, the safety of any other person and the community and the orderly administration of justice." The court has a duty to tailor the conditions of pretrial release to the needs and risks posed by each individual defendant. *See id.* For example, if a defendant is charged with a crime of violence against a household member, the additional conditions might include a limitation on the possession of weapons and a requirement that the defendant avoid contact with the alleged victim or witnesses. *See* Rule 5-401(D)(2)(e), (h). Or, if the defendant is charged with a crime involving controlled substances, the court might order the defendant to undergo drug testing and substance abuse treatment. *See* Rule

5-401(D)(2)(j)-(k).

**5.     The District Court Requirement of a Monetary Bond in This Case Was Unsupported by Evidence and Contrary to Law**

{42}     In brief, a pretrial release determination under the New Mexico Constitution and our rules of criminal procedure includes three main inquiries. First, is the defendant bailable pending trial, or should the defendant be detained under one of the exceptions in Article II, Section 13 of the New Mexico Constitution? Next, if bailable, which of the release options stated in Rule 5-401 is the least restrictive in reasonably assuring appearance while maintaining the safety of the community? *See* Rule 5-401(A)-(B). And finally, should any additional nonmonetary conditions of release be imposed to place limitations on the defendant's conduct while released pending trial? *See* Rule 5-401(D).

{43}     This Court will reverse a district court's pretrial release decision "only if it is shown that the decision: (1) is arbitrary, capricious or reflects an abuse of discretion; (2) is not supported by substantial evidence; or (3) is otherwise not in accordance with law." Rule 12-204(C). Although this Court may set aside a pretrial release order for any one of these three reasons, we conclude in this case that reversal is warranted on all three grounds. *See N.M. Attorney Gen. v. N.M. Pub. Regulation Comm'n*, 2013-NMSC-042, ¶ 10, 309 P.3d 89 (explaining that a decision "is arbitrary and

36

capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record" (internal quotation marks and citation omitted)); *State v. Cebada*, 1972-NMCA-140, ¶ 9, 84 N.M. 306, 502 P.2d 409 ("An abuse of discretion occurs when the court exceeds the bounds of reason, all the circumstances before it being considered."). "Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion." *State ex rel. King v. B&B Inv. Group, Inc.*, 2014-NMSC-024, ¶ 12, 329 P.3d 658 (internal quotation marks and citation omitted).

{44} The district court necessarily determined that Defendant was bailable by entering a pretrial release order at Defendant's arraignment in 2011 but then imposed the most restrictive type of bail available under Rule 5-401, a full cash or surety bond in the amount of $250,000. *See* Rule 5-401(B)(3). The court also prohibited Defendant from possessing firearms, alcohol, or illegal drugs; violating the law; leaving the county without the court's permission; entering liquor establishments; or making contact with any alleged victim, codefendant, or witness in the case. Additionally, the district court required that Defendant maintain weekly contact with his attorney and notify his attorney of any changes to his contact information.

{45} It is not clear from the record before this Court what, if any, information the

district court had when it first entered the pretrial release order at Defendant's arraignment, and we do not review that earlier decision. We address only the ruling that has been appealed to us, the refusal to modify the $250,000 cash or surety bond that Defendant was unable to post.

{46} After the first bail review hearing, the district court found there were no facts indicating that Defendant would likely "commit new crimes," pose "a danger to anyone," or "be unlikely to appear if released." The information Defendant presented at the second review hearing was consistent with the information he presented in support of his first motion. The State failed to present any new information at the second hearing or to controvert Defendant's evidence and continued to rely solely on the nature of the crime charged. The district court, without a further written order, declined to change the conditions of release, stating merely that Defendant "*may* present a danger of either flight or to other members of the community," in contrast to the court's own finding following the first motion hearing that Defendant did not pose a flight or safety risk (emphasis added).

{47} Contrary to the explicit requirements set forth in our rules, the district court failed to explain in the record any rational connection between the facts in the record and the ruling of the court, perhaps because there was no such connection. *See* Rule

5-401(G) ("Unless the release order is amended and the person is thereupon released, the court shall state in the record the reasons for continuing the amount of bail set."); *see also Gutierrez*, 2006-NMCA-090, ¶ 21 (cautioning judges to follow the directives of Rule 5-401 when "exercising their discretion to set conditions of release"). We hold that the district court's decision was arbitrary and capricious and that the court abused its discretion by issuing a ruling at the second motion hearing that was contrary to both the record and the district court's previous findings of fact, without articulating any principled reason or factual basis for the decision.

{48}    All of the evidence Defendant presented supported a modification of Defendant's bail, and none of the evidence supported the district court's decision to keep the $250,000 bond in place. The State failed to controvert Defendant's evidence, offered no evidence of its own, and declined to cross-examine Defendant's witnesses. The district court denied Defendant's first motion despite the court's express finding that there were no facts indicating that Defendant would pose a flight or safety risk if released. The district court denied Defendant's second motion without entering any findings of fact to support its decision, explaining only that "the nature of the allegations" and "the exposure that is contained within the various counts of the indictment" led the court to conclude that releasing Defendant "may present a danger

of either flight or to other members of the community." This conclusion is inconsistent with the record and unsupported by substantial evidence.

{49} The district court's decision was contrary to Rule 5-401, which sets forth the mandatory procedure for district courts to follow when making a pretrial release decision. The district court was required to evaluate and balance each of the factors set forth in Rule 5-401(C) and to impose the least restrictive of the bail options and release conditions necessary to reasonably assure that Defendant would not pose a flight or safety risk. The record makes it clear that the court did not comply with the law.

{50} The findings of fact the district court entered following the first motion hearing demonstrate that all of the information regarding Defendant's personal history and characteristics supported a reduction of Defendant's bond. The district court found that Defendant "would have an appropriate place to live with his father," that Defendant's "former employers were seeking his return to employment," and that Defendant's "ties in the community are longstanding and continuing with the familial support of his parents." The district court also found that Defendant had no pending criminal charges, no alcohol or substance abuse problems, and no history of violence outside the allegations in this case. And the district court found that Defendant had

"been entirely compliant for the entirety of his pretrial incarceration of over 2 years and 4 months" and had "appeared timely and without incident at all scheduled hearings in this case." Finally, the district court documented the absence of any facts indicating that Defendant would predictably "commit new crimes," pose "a danger to anyone," or "be unlikely to appear if released." Although the district court noted that it had drawn no conclusions "as to the weight of the evidence" against Defendant, it denied Defendant's first motion solely because of "the nature and seriousness of the alleged offense."

{51}    It is clear that the district court based its pretrial release decision on only one of the factors identified in Rule 5-401(C)—"the nature and circumstances of the offense charged"—to the exclusion of all other factors. While a judge has discretion to evaluate and balance each of the factors set forth in Rule 5-401(C), the judge "shall" consider and weigh all of the factors, and no single factor automatically controls. *See* Rule 5-401(C). Appropriately, the district court considered the charges and potential punishment in this case in assessing flight risk and danger to the community posed by this Defendant, but the district court failed to balance this information with the evidence presented in support of Defendant's motion. Because the district court failed to give proper consideration to all of the factors set forth in

41

Rule 5-401(C), its continued imposition of the $250,000 bond was contrary to law.

{52}     Neither the Constitution nor our rules of criminal procedure permit a judge to base a pretrial release decision solely on the severity of the charged offense. Bail is not pretrial punishment and is not to be set solely on the basis of an accusation of a serious crime. As the United States Supreme Court has emphasized, "[t]o infer from the fact of indictment alone a need for bail in an unusually high amount is an arbitrary act." *Stack v. Boyle*, 342 U.S. at 6. The State has argued that $250,000 is a standard bond for an offense that can result in life imprisonment. This argument runs contrary to both the letter and purpose of Rule 5-401, which requires the judge to make an informed, individualized decision about each defendant and does not permit the judge to put a price tag on a person's pretrial liberty based solely on the charged offense. *See ABA Standards*, Standard 10-5.3(e), at 110 ("Financial conditions should be the result of an individualized decision taking into account the special circumstances of each defendant, the defendant's ability to meet the financial conditions and the defendant's flight risk, and should never be set by reference to a predetermined schedule of amounts fixed according to the nature of the charge."). Empirical studies indicate that the severity of the charged offense does not predict whether a defendant will flee or reoffend if released pending trial. *See* Curtis E.A. Karnow, *Setting Bail*

*for Public Safety*, 13 Berkeley J. Crim. L. 1, 14-16 (2008) (reviewing studies indicating that "evidence does not support the proposition that the severity of the crime has any relationship either to the tendency to flee or to the likelihood of re-offending"); 4 Wayne LaFave et al., *Criminal Procedure*, § 12.1(b), at 12 (3d ed. 2007) (citing studies and stating that the "likelihood of a forfeiture does not appear to depend upon the seriousness of the crime"). Setting money bail based on the severity of the crime leads to either release or detention, determined by a defendant's wealth alone instead of being based on the factors relevant to a particular defendant's risk of nonappearance or reoffense in a particular case. *See Hairston v. United States*, 343 F.2d 313, 316-17 (D.C. Circ. 1965) (Bazelon, C.J., dissenting) ("Setting high bail to deny release discriminate(s) between the dangerous rich and the dangerous poor and masks the difficult problems of predicting future behavior which is, in itself, fraught with danger of excesses and injustice." (alteration in original) (internal quotation marks and citation omitted)). Because of this, judges "should exercise care not to give inordinate weight to the nature of the present charge in evaluating factors for the pretrial release decision." *ABA Standards*, Standard 10-1.7, at 50.

{53}     Neither the New Mexico Constitution nor our rules of criminal procedure permit a judge to set high bail for the purpose of preventing a defendant's pretrial

43

release. *See* N.M. Const. art. II, § 13; Rule 5-401; *see also Bandy*, 81 S. Ct. at 198 ("It would be unconstitutional to fix excessive bail to assure that a defendant will not gain his freedom."). Intentionally setting bail so high as to be unattainable is simply a less honest method of unlawfully denying bail altogether. If a defendant should be detained pending trial under the New Mexico Constitution, then that defendant should not be permitted any bail at all. Otherwise the defendant is entitled to release on bail, and excessive bail cannot be required. N.M. Const. art. II, § 13; *cf.* 18 U.S.C. § 3142(c)(2) (providing that a federal "judicial officer may not impose a financial condition that results in the pretrial detention of the person"), *held unconstitutional on other grounds by, e.g.*, *Karper*, 847 F. Supp. 2d 350.

{54}   We understand that this case may not be an isolated instance and that other judges may be imposing bonds based solely on the nature of the charged offense without regard to individual determinations of flight risk or continued danger to the community. We also recognize that some members of the public may have the mistaken impression that money bonds should be imposed based solely on the nature of the charged crime or that the courts should deny bond altogether to one accused of a serious crime. We are not oblivious to the pressures on our judges who face election difficulties, media attacks, and other adverse consequences if they faithfully

44

honor the rule of law when it dictates an action that is not politically popular, particularly when there is no way to absolutely guarantee that any defendant released on any pretrial conditions will not commit another offense. The inescapable reality is that no judge can predict the future with certainty or guarantee that a person will appear in court or refrain from committing future crimes. In every case, a defendant *may* commit an offense while out on bond, just as any person who has never committed a crime *may* commit one. As Justices Jackson and Frankfurter explained in reversing a high bond set by a federal district court, "Admission to bail always involves a risk that the accused will take flight. That is a calculated risk which the law takes as the price of our system of justice." *Stack v. Boyle*, 342 U.S. at 8 (Jackson, J., joined by Frankfurter, J., specially concurring).

## III.    CONCLUSION

{55}    For the reasons stated in this opinion, we reaffirm our prior order holding that the district court unlawfully failed to release Defendant pending trial on the least restrictive of the bail options and release conditions necessary to reasonably assure Defendant's appearance and the safety of the community, our reversal of the district court's continued imposition of a $250,000 bond, and our order that Defendant be released on nonmonetary conditions pending trial.

{56}   **IT IS SO ORDERED.**


_____

**CHARLES W. DANIELS, Justice**

**WE CONCUR:**


_____

**BARBARA J. VIGIL, Chief Justice**


_____

**RICHARD C. BOSSON, Justice**


_____

**EDWARD L. CHÁVEZ, Justice**

46