The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

**IN THE SUPREME COURT OF THE STATE OF NEW MEXICO**

**Opinion Number: _____**

**Filing Date:** May 22, 2023

**NO. S-1-SC-39744**

**STATE OF NEW MEXICO,**

    Plaintiff-Appellant,

v.

**JOE ANDERSON,**

    Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
Emeterio L. Rudolfo, District Judge

Raúl Torrez, Attorney General
Charles J. Gutierrez, Assistant Attorney General
Santa Fe, NM

for Appellant

Bennett J. Baur, Chief Public Defender
Kimberly M. Chavez Cook, Appellate Defender
Santa Fe, NM

Fenderson Firm
Keren H. Fenderson
Albuquerque, NM

for Appellee

**OPINION**

**ZAMORA, Justice.**

{1}     In this opinion concerning pretrial detention, we explain our reasons for issuing an order reversing the district court's denial of the State's motion for pretrial detention of Defendant Joe Anderson, charged with first-degree murder pursuant to NMSA 1978, Section 30-2-1(A)(1) (1994). Under this Court's interpretation of Article II, Section 13 of the New Mexico Constitution, a defendant charged with a felony can be detained without bail prior to trial if the State demonstrates by clear and convincing evidence that (1) the defendant is dangerous and (2) no release conditions will reasonably protect the safety of any individual or the community. *See State v. Mascareno-Haidle*, 2022-NMSC-015, ¶ 27, 514 P.3d 454; Rule 5-409(F)(4) NMRA. In this case, Defendant's dangerousness is not disputed. At issue is the second prong of the pretrial detention inquiry: whether the State met its burden to prove by clear and convincing evidence that no release conditions could reasonably protect any individual or the community.

{2}     The State presented reliable evidence that Defendant had an extensive criminal history that included crimes of violence, failures to appear, violations of probation, new charges while on probation, committing felonies while incarcerated, knowingly possessing a firearm while a felon, and noncompliance with pretrial

services requirements. This evidence amply satisfied the State's burden to prove that no release conditions would reasonably protect the community. We hold that the district court abused its discretion when it denied the State's motion without properly weighing the required factors under Rule 5-409(F)(6).

## I.     BACKGROUND

### A.     State's Evidence in Support of Pretrial Detention

{3}     In support of its motion for pretrial detention, the State tendered documentary exhibits, which included a list of Defendant's criminal cases printed from New Mexico court records, a public safety assessment (PSA) of Defendant completed by the Second Judicial District Court's pretrial services division, numerous case details of court actions in Defendant's previous criminal cases, and criminal complaints filed in two cases. Defendant did not object to these exhibits. During the hearing, the State also made several proffers, as is permitted in a pretrial detention hearing. *See State ex rel. Torrez v. Whitaker*, 2018-NMSC-005, ¶ 110, 410 P.3d 201.

### 1.     Evidence supporting the current first-degree murder charge

{4}     Defendant is charged with first-degree murder over a simple property dispute. According to the criminal complaint, when the victim did not return Defendant's motorcycle "as promised," Defendant hunted down the victim and shot him in the street. Defendant is alleged to have had an accomplice on this mission who took

possession of the motorcycle as the victim lay dying. Defendant is alleged to have then returned to the crime scene and chatted with police, presenting himself as a concerned citizen and offering the police his phone number.

{5}     The evidence linking Defendant to the crime is the following. Police found the victim's body in the middle of the street in the early morning hours of August 6, 2022. The victim had been shot while driving the motorcycle, one of his legs was burned by the hot exhaust pipe, and gasoline had leaked onto the victim's body. Police set up a perimeter around the crime scene. A group of four people, two men and two women, approached an officer who was guarding the perimeter and asked the officer about the identity of the victim. One of the men—"very distinctive looking" with a shaved head and tattoos covering his head, neck, hands, and arms—gave the officer his phone number and told the officer to "'get ahold of us anytime'" with more information about the victim. One of the women in the group, as it later turned out, was the victim's girlfriend.

{6}     The victim's girlfriend told police that she was with Defendant at the crime scene when the group spoke with the officer and that Defendant was the man who gave the officer his phone number. She stated that her boyfriend, the victim, had borrowed a "'Harley-kind'" of motorcycle from Defendant. She told police that

Defendant lived in an apartment on Vail Avenue, just one street north of the crime scene.

{7}   Surveillance video from a parking lot near the crime scene showed a white Ford Expedition SUV pulling in behind the victim as he got on a "'Harley-style'" motorcycle. The victim looked back at the SUV and fled on the motorcycle out of camera view while the driver and passenger got out of the SUV and ran after the victim. The driver "appear[ed] to be holding an object in his right hand." Within a minute, the driver returned to camera view, got into the SUV, and drove away. Meanwhile, the passenger could be seen in another surveillance video attempting to start the motorcycle several times before slowly walking the motorcycle down the street.

{8}   Police observed a white Ford Expedition SUV in the parking lot of the apartment complex on Vail Avenue where the victim's girlfriend said that Defendant lived. The SUV had a University of New Mexico license plate, heavy window tint, and "distinctive black rims." Police confirmed through Motor Vehicle Division records and other sources that Defendant was "associated with" several vehicles including motorcycles and a white Ford Expedition SUV.

{9}   Lapel camera footage showed that the man who approached the police officer and offered his phone number had the same build and physical characteristics as the

man seen in the surveillance video driving the SUV from the parking lot near the crime scene. In both videos, the man was wearing identical clothing, including a baseball shirt, long shorts, and distinctive black and white sneakers.

{10} A confidential source contacted police with information about the details of the crime. The source stated that Defendant "lent [the victim] his motorcycle" and "[the victim] did not return the motorcycle as promised." The source stated that Defendant's girlfriend told Defendant where the victim was, whereupon Defendant and another individual "chased after [the victim]." Defendant shot "[the victim] multiple times in the street," and "the motorcycle was taken away from the area." The confidential source also described Defendant's vehicle as a white Ford Expedition SUV with a University of New Mexico license plate and custom rims and tires, which aligned with the appearance of the vehicle in the surveillance video and the vehicle that police observed in the parking lot of the apartment complex on Vail Avenue.

{11} The manager of the apartment complex on Vail Avenue confirmed that Defendant had recently lived in one of the apartments and that the phone number given to the police officer at the crime scene was Defendant's phone number. However, by the time police spoke to the manager, Defendant and his girlfriend had moved out of the apartment, and the manager did not know where they had gone.

## 2. Defendant's criminal history

{12} Defendant's criminal history reflects near constant involvement in the criminal justice system over nineteen years. The State presented evidence of this criminal history in the form of printouts of publicly available court records detailing the actions taken in each of Defendant's cases.

{13} Defendant's criminal history began in 2003 when Defendant pleaded no contest to aggravated battery on a household member, child abuse, and resisting or evading an officer in case number D-202-CR-2003-00024. Defendant successfully completed probation in that case in September 2006.

{14} In February 2007, Defendant was indicted on four felonies in case number D-202-CR-2007-00643: receiving or transferring a stolen motor vehicle; possessing a controlled substance; conspiring to commit receiving or transferring a stolen motor vehicle; and tampering with evidence. Defendant failed to appear twice in that case, first to a pretrial proceeding and then to the trial itself. After Defendant failed to appear at the trial, a bench warrant was issued and was outstanding for nearly one month before Defendant turned himself in. Despite Defendant's failures to appear, the district court accepted a plea to a conditional discharge on March 10, 2009, and ordered Defendant to complete twelve months of supervised probation. Just three months later, the State filed a motion to revoke probation. A bench warrant was

6

issued and was outstanding for twenty days before Defendant was arrested. At a probation violation hearing on July 1, 2009, Defendant admitted to violating probation. The district court found a probation violation and then reinstated his probation.

{15} While Defendant was on probation in case number D-202-CR-2007-00643, he was charged on June 18, 2009, with armed robbery in a different county, in case number D-1329-CR-2009-00289. Despite his pending armed robbery charge, the district court in case number D-202-CR-2007-00643 granted Defendant's conditional discharge on March 26, 2010. The State voluntarily dismissed the armed robbery charge approximately three months later on June 18, 2010.

{16} Five months later, Defendant shot and killed a man. *See State v. Anderson*, A-1-CA-35876, mem. op. ¶¶ 2, 8 (N.M. Ct. App. June 17, 2019) (nonprecedential). For that incident, Defendant was indicted for first-degree murder, voluntary manslaughter, kidnapping, tampering with evidence, conspiracy to tamper with evidence, aggravated battery with a deadly weapon, and false imprisonment in case number D-202-CR-2010-05929. The district court placed Defendant on a no bond hold, denying him the possibility of release on bail. Less than a year later, Defendant filed a motion to review conditions of release, after which the district court set Defendant's bail at $1,000,000 cash or surety. Defendant did not make bail. At trial,

7

the jury convicted Defendant of second-degree murder, and Defendant was sentenced to sixteen years in prison.

{17} On appeal, Defendant was granted a new trial. *See State v. Anderson*, 2016-NMCA-007, ¶ 1, 364 P.3d 306. During the pendency of that appeal, Defendant pleaded guilty to two new felonies that he committed while in prison: conspiracy to commit narcotics trafficking and conspiracy to commit distribution of a nonnarcotic controlled substance, in case number D-506-CR-2014-00375.

{18} At Defendant's new trial on the murder charge, a new jury convicted Defendant of voluntary manslaughter and a firearm enhancement. The district court sentenced Defendant to seven years in prison. Defendant was released in 2019.

**3.  Concurrent felony charges**

{19} At the time of the pretrial detention hearing in this case, Defendant also stood charged with four additional felonies in a separate case, D-202-CR-2022-01951. That case arose from Defendant's arrest on August 18, 2022, twelve days after the homicide at issue in this case, for an incident that occurred in the parking lot of the Vail Avenue apartments where Defendant lived. In that incident, police observed Defendant in a stolen, gold Chevy Tahoe. When police approached Defendant, he admitted that he had a gun. He further admitted that he knew he was a felon and was not permitted to have a gun but explained that he needed the gun for protection.

Upon his arrest, Defendant was found in possession of fentanyl pills and methamphetamine.

{20} In that case, Defendant's four charged felonies were possession of a firearm by a felon, receiving or transferring a stolen motor vehicle, and two counts of possession of a controlled substance. The State filed a motion for pretrial detention in that case on August 22, 2022, approximately four months before the murder charge was brought in the instant case. On August 29, 2022, the district court denied the motion and, on September 6, 2022, set release conditions that included requirements for Defendant to be supervised by pretrial services and to submit to random urinalysis upon the request of pretrial services.

**4.      Noncompliance with pretrial services supervision**

{21} At the January 10, 2023, detention hearing in this case, the district court inquired about Defendant's compliance with pretrial services supervision in the concurrent, pending case, D-202-CR-2022-01951. The pretrial services officer responsible for supervising Defendant in that case informed the court that Defendant forgot to check in with the officer every week and that the officer had to call to remind Defendant of his responsibilities. Despite these reminders, the officer recounted that Defendant failed to report to pretrial services for two weeks in a row. As a consequence of Defendant's failure to report, the officer had requested a bench

warrant for noncompliance with pretrial services. That warrant was canceled as a result of Defendant's arrest on the first-degree murder charge in this case.

{22} Additionally, the pretrial services officer in the concurrent, pending case informed the court that, for approximately the last three months, Defendant had not called pretrial services for random urinalysis as required.

**5.     Other evidence**

{23} The State offered additional reasons that no conditions of release could reasonably protect public safety. The State entered into evidence the results of a public safety assessment that flagged Defendant as a person who is at risk of committing new violent crimes if released pretrial. The PSA scored Defendant five-out-of-six for risk of new criminal activity and recommended that if Defendant were to be released, he be released at the highest level of supervision.[1]

{24} The prosecutor proffered that Defendant's girlfriend—with whom Defendant had lived and who is a witness in this case—owned a firearm and that "pretrial services does not perform home visits" and could not ensure that Defendant would not have access to that firearm. The prosecutor also proffered that Defendant did not have a current known residence.

---

[1]The PSA is only a tool to assess the level of supervision *if* there is a release. It is not a guide or mandate for a judge to in fact release a defendant.

10

**B.     Defendant's Evidence in Favor of Release**

{25}     Defendant called an alibi witness, James Murray, who testified that he was with Defendant and Defendant's girlfriend at their apartment complex on the night of the shooting. He testified that they heard gunshots in the neighborhood and remained in their apartment complex until Defendant went to the store twenty-five or thirty minutes later, "to get some milk for the formula for the baby."

{26}     On cross-examination, Mr. Murray admitted that he was part of the group of four people who approached the crime scene and spoke to the officer. He identified the members of the group as "me, [Defendant] and his wife, and the pregnant girl." The prosecutor did not inquire into whether Mr. Murray knew "the pregnant girl," who presumably was the victim's girlfriend as stated in the criminal complaint. The prosecutor also did not inquire into the circumstances behind this group's decision to gather and go to the crime scene; nor did she ask about the timeline of Defendant's alleged trip to the store for milk in relation to the group's trip to the crime scene. Instead, the prosecutor focused her cross-examination on whether Mr. Murray provided false contact information to the officer at the scene, which he denied.

{27}     The defense then played the surveillance video. The district court asked whether the lapel camera video was also available; the prosecutor stated that it was available, but "it isn't my turn yet." The district court did not request that the

prosecutor play the video but instead invited the defense to make its argument. The lapel camera video was not played at any time during the hearing.

**C.    The District Court's Ruling**

{28}    Before announcing its ruling, the district court inquired about the timeline of the prosecution. The prosecutor informed the court that although the homicide occurred in August, the confidential source did not come forward until October. The court noted that the complaint was not filed until December. The district court then shared its thoughts about the evidence:

> The troubling things I guess are—and it's kind of hard not to want to consider, and we should consider, the past history and that conviction— the jury found him guilty of, what was it, voluntary manslaughter? And in this instance, I think when you read the complaint, and you see 'distinct shoes' and 'distinct tattoos' that were corroborated by the video, it just seems like a big stretch in saying that the video shows any of that. The socks and shorts, and not my style personally, but we saw that the guy on the motorcycle is wearing long shorts and long socks. That in certain neighborhoods and in certain groups is not uncommon to see. It is not a distinct look. It's a pretty common look, to be wearing the long shorts, especially in August.
>
> And then, we don't know what happened off video. We don't know if the shooter, if the evidence, I mean if it turns out that [Defendant] was in fact the person in that vehicle, chasing after someone for a stolen motorcycle, what happens off camera? Does the other person who's fleeing with the stolen motorcycle pull out a firearm, pull out a weapon? And is there anything else in, um. I mean, I guess my point is that the evidence on first glance in reading the complaint seems really, really strong for the State. And then after seeing that videoclip—more so the videoclip than Mr. Murray's testimony—it isn't as clear as I felt that it

12

would be based on the complaint. But that's one factor, I guess, is the weight of the evidence.

The other thing that I feel is the State, or the police, the government, viewed him as such a threat, having this information since October and then not acting until December, I don't know. To me that, and nothing, and thank goodness that there's no other offenses or anything. But nothing having occurred or no other violations of the orders on the other case kind of, and in light of the pretrial services [PSA], kind of makes me lean towards releasing [Defendant].

{29} The district court found that the State's evidence was reliable and that Defendant would likely pose a threat to the safety of others if released pending trial. However, the district court stated that "the big question" was whether any conditions of release could reasonably protect the public. The district court stated that while it had concerns about Defendant's "criminal history and the fact that a gun is alleged to have been used in this case," it "didn't see anything [indicating] that a gun was found or [Defendant] had a gun in his possession or warrants were executed and firearms were found."

{30} In response, the State clarified that while no firearms were found on the victim, warrants had been executed and a firearm belonging to Defendant's girlfriend had been found. The State also noted that Defendant had been found in possession of a firearm and that Defendant admitted to having a firearm in his concurrent, pending case, D-202-CR-2022-01951, the events of which took place after the alleged murder in this case.

13

{31} Without providing any further rationale, the district court denied the State's motion for pretrial detention and placed Defendant on the same conditions of release that had been imposed in his concurrent case, with the addition of a GPS ankle monitor.

{32} In its written order, the district court repeated its initial findings that the State's evidence was reliable and that Defendant was dangerous. However, it found "that any danger [Defendant] may pose on the community can be mitigated because of [Defendant's] performance on probation in the past as well as his performance on pretrial services in the pending cause number D-202-CR-2022-01951 where there have been no allegations of violations of conditions of release." Specifically, the district court found that "[t]he history and characteristics of [Defendant] indicate that there are conditions of release that can mitigate the danger he may pose to the community" because he "successfully [completed] probation in both causes D-202-CR-2003-00024 and D-202-CR-2007-00643." "Furthermore," the court found, "[Defendant] is currently on pretrial services in cause number D-202-CR-2022-01951 where there have been no allegations of violations of conditions of release."

**D.  The State's Appeal**

{33} The State appealed to this Court pursuant to Rule 12-204 NMRA, arguing that the district court abused its discretion when it held that the State failed to prove that

no conditions of release could reasonably protect the safety of any individual or the community. We ordered a response from Defendant. After considering the written submissions, we issued an order reversing the district court and remanding Defendant into custody. We now write to explain our reasoning for reversing the district court and ordering Defendant's pretrial detention.

## II. DISCUSSION

### A. Standard of Review

{34} This Court may reverse a district court's ruling on pretrial detention if the ruling "is arbitrary, capricious, or reflects an abuse of discretion; . . . is not supported by substantial evidence; or . . . is otherwise not in accordance with law." Rule 12-204(D)(2)(b). "[A] decision is arbitrary and capricious if it is unreasonable or without a rational basis, when viewed in light of the whole record." *State v. Groves*, 2018-NMSC-006, ¶ 25, 410 P.3d 193 (internal quotation marks and citation omitted). "An abuse of discretion occurs when the court exceeds the bounds of reason, all the circumstances before it being considered." *State v. Brown*, 2014-NMSC-038, ¶ 43, 338 P.3d 1276 (internal quotation marks and citation omitted). "Substantial evidence is such relevant evidence that a reasonable mind would find adequate to support a conclusion." *Groves*, 2018-NMSC-006, ¶ 25 (internal quotation marks and citation omitted).

**B.     Rule 5-409 Provides the Mandatory Analytical Framework for Preventive Detention Determinations**

{35}     Rule 5-409(F)(6) states plainly that the district court "shall consider *any fact* relevant to the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release and any fact relevant to the issue of whether any conditions of release will reasonably protect the safety of any person or the community." (Emphasis added.) Rule 5-409(F)(6) then sets forth a nonexhaustive list of factors that the district court must consider, at a minimum, in making its determination:

> (a) the nature and circumstances of the offense charged, including whether the offense is a crime of violence;
>
> (b) the weight of the evidence against the defendant;
>
> (c) the history and characteristics of the defendant;
>
> (d) the nature and seriousness of the danger to any person or the community that would be posed by the defendant's release;
>
> (e) any facts tending to indicate that the defendant may or may not commit new crimes if released;
>
> (f) whether the defendant has been ordered detained under Article II, Section 13 of the New Mexico Constitution based on a finding of dangerousness in another pending case or was ordered detained based on a finding of dangerousness in any prior case; and
>
> (g) any available results of a pretrial risk assessment instrument approved by the Supreme Court for use in the jurisdiction, provided that the court shall not defer to the recommendation in the instrument but

16

> shall make an independent determination of dangerousness and community safety based on all information available at the hearing.

*Id.*

{36}   As we have repeatedly emphasized, no single factor is dispositive; instead, the district court must consider the totality of the circumstances in reaching a decision on pretrial detention. *See, e.g.*, *Mascareno-Haidle*, 2022-NMSC-015, ¶ 36 ("[C]ontrolling precedent from this Court . . . makes clear that pretrial detention or release decisions cannot be made to turn on any single factor, be it the nature and circumstances of the charged offense(s) or otherwise."); *see also Groves*, 2018-NMSC-006, ¶ 34 (examining "the totality of Defendant's conduct"). "A detention-hearing court must take into account both the personal rights of the accused and the broader public interest as it makes a pretrial detention decision." *Torrez*, 2018-NMSC-005, ¶ 96. Because this delicate balancing necessarily requires an individualized risk assessment, the district court must take care to explain its reasoning, in writing, as to how each factor applies to the specific facts of the case. *See State v. Ferry*, 2018-NMSC-004, ¶ 7, 409 P.3d 918 ("[D]istrict court judges are required to file written findings of the individualized facts justifying the detention of the defendant or the denial of the detention motion.").

{37}   In this case, the district court applied the wrong test: it did not apply the Rule 5-409 factors but instead analyzed the case through the lens of *Groves*, which

17

described three general "categories of determinations" that the district court must make at a detention hearing. *Groves*, 2018-NMSC-006, ¶ 29 (affirming categories set forth in *Torrez*, 2018-NMSC-005, ¶¶ 99-102). Those general categories can be summarized as evidentiary reliability, the defendant's dangerousness, and whether release conditions can reasonably protect the community. *Id.* While it remains true that district courts rule on those issues at every detention hearing, *Groves* described the state of the law prior to the enactment of Rule 5-409. *See Groves*, 2018-NMSC-006, ¶ 27 ("The proceedings below occurred . . . before promulgation of our procedural rules governing application of the broad constitutional language, in particular new Rule 5-409 NMRA, governing detention proceedings in district court."); *see also id.* ¶¶ 30, 32, 35, 40 (applying Rule 5-401 NMRA rather than Rule 5-409 to the facts of that case). In the pretrial detention cases that were decided immediately following the 2016 constitutional amendment but before Rule 5-409 was enacted in 2017, our courts "were necessarily working with broad constitutional concepts and without the more detailed procedural guidance that would be provided by our subsequent bail rule amendments." *Torrez*, 2018-NMSC-005, ¶ 73. District courts must now comply with the requirements of Rule 5-409 rather than simply applying the broad constitutional language of *Groves* and *Torrez*.

{38} Therefore, a district court must now make specific factual findings on the Rule 5-409 factors and on any other fact that it has considered when arriving at its decision on release or detention. Here, the district court listed generalized Rule 5-409 factors in its written order but failed to apply them to specific, individualized facts of the case. The district court's failure to give these factors case-specific consideration is contrary to law and grounds for reversal under Rule 12-204(D)(2)(b)(iii). However, we will not disturb the decision of a district court if it was right for another reason. *State v. Gallegos*, 2007-NMSC-007, ¶ 26, 141 N.M. 185, 152 P.3d 828. In this case, the district court's ultimate conclusion was incorrect. As we explain, a proper application of Rule 5-409 factors to this case demonstrates that no release conditions could reasonably protect the public from Defendant.

**C.     The District Court Abused Its Discretion When It Failed to Conclude That No Release Conditions Can Reasonably Protect the Public**

{39} Although Rule 12-204 sets forth a stringent standard for reversal, this case meets that standard in all three respects. *See* Rule 12-204(D)(2)(b) (permitting reversal of a district court ruling that is an abuse of discretion, unsupported by substantial evidence, or otherwise not in accordance with law).

{40} In this case, as discussed above, the district court did not apply the correct analytical framework of Rule 5-409 and did not make individualized findings as to each factor in Rule 5-409(F)(6). That error rendered the ruling not in accordance

19

with law. Additionally, the district court's ruling was not based on substantial evidence because, contrary to the district court's findings, Defendant did not in fact comply with release supervision in the cases cited by the district court. Finally, Defendant's extensive criminal history, along with the pending charges and facts, establish that it was beyond reason—and therefore an abuse of discretion—to conclude that release conditions could reasonably protect the public from Defendant's dangerous behavior.

**1. The district court's ruling was not based on substantial evidence**

{41} The district court's ruling was explicitly based on Defendant's compliance with release supervision in three other cases: D-202-CR-2003-00024, a domestic violence and child abuse case from 2003; D-202-CR-2007-00643, a drug case from 2007; and D-202-CR-2022-01951, the concurrent, pending, felon-in-possession case. The evidence, however, shows that Defendant did not comply with release supervision in each of those cases. Therefore, the district court's ruling was not supported by substantial evidence. While it is true that Defendant successfully completed probation in the first case, ultimately received a conditional discharge in the second case, and was not formally adjudicated as violating conditions of release in the third case, the district court failed to consider evidence before it that Defendant

had been noncompliant during the pendency of his release supervision in those cases. That evidence is the following.

{42}   The record in D-202-CR-2007-00643 reflects that Defendant twice failed to appear in court, including at his own trial. After he failed to appear at trial, Defendant remained at large with an outstanding bench warrant for several weeks. These failures to appear and the bench warrant do not provide evidence of compliance with release supervision.

{43}   The record in that case also reflects that after pleading guilty, Defendant violated probation. A bench warrant was issued that remained outstanding for several more weeks. Defendant admitted to the violation, and his probation was revoked and then reinstated. That probation violation, warrant, and probation revocation do not support a finding of compliance with release supervision.

{44}   Further, the district court heard direct testimony from the pretrial services officer supervising Defendant's release in the concurrent, pending case, D-202-CR-2022-01951, that Defendant was failing to report to pretrial services and that the officer had requested a bench warrant for that failure. The district court also heard direct testimony from the pretrial services officer that Defendant, three months earlier, had entirely ceased calling in to pretrial services for random urinalysis as

was required under his conditions of release. This evidence of noncompliance does not support finding compliance with release supervision.

{45}    Therefore, the district court's ruling that Defendant was compliant in these three cases was not based on substantial evidence. Moreover, the district court's reliance on Defendant's release supervision in those three isolated cases was a thin reed on which to rest its decision in light of the myriad other considerations called for in Rule 5-409, which we discuss below.

**2.      The district court abused its discretion when it concluded that there were release conditions that could reasonably protect the safety of the public from Defendant**

{46}    In this case, ample evidence showed that Defendant was unlikely to comply with release conditions and that the public would be put at significant risk should he fail to comply with release conditions.

{47}    The nature and circumstances of the crime were extremely violent. *See* Rule 5-409(F)(6)(a). Defendant stands accused in this case of first-degree murder, assisted by an accomplice, in response to a simple property dispute. The murder was carried out in the middle of a neighborhood street, and the motorcycle was taken from the dying victim. Defendant then allegedly went to the crime scene with the victim's pregnant girlfriend shortly after the murder in an attempt to construct an alibi.

{48}  The weight of the evidence against Defendant is heavy. *See* Rule 5-409(F)(6)(b). Surveillance video, information provided by the confidential source, and statements from the victim's girlfriend all indicate Defendant's connection to the murder. Police investigation corroborated important details, such as Defendant's address, phone number, and ownership of vehicles.

{49}  Defendant's history and characteristics strongly indicate that no release conditions will reasonably protect the public. *See* Rule 5-409(F)(6)(c). His history consists of nearly two decades of criminal behavior, including crimes of violence—beginning with violence against household members, including children, in 2003—that escalated to homicide by 2010. And Defendant's history is replete with failures to comply with official directives. As discussed herein, Defendant has a history of failures to appear, bench warrants, and probation violations. Defendant also has a history of overlapping cases. He picked up new felony convictions in 2008 while in prison for homicide, and acquired a new felony charge while on probation in 2009 He also recently admitted to being a felon in possession of a firearm in knowing violation of the law.

{50}  Defendant poses a serious danger to others if released because he stands accused of a crime that potentially carries a life sentence and because his case depends in large part on the testimony of witnesses. *See* Rule 5-409(F)(6)(d).

Defendant has physically harmed others before and has even killed. As the State pointed out in the detention hearing, the allegations in the instant case indicate Defendant's willingness to retaliate with violence against others over a mere property dispute. From these facts, it is reasonable to infer that witnesses against Defendant could also be in danger of Defendant's retaliatory violence.

{51}    Facts that indicate Defendant may commit new crimes if released include his history of picking up new charges while on probation and in prison, his long history of near continual contact with the criminal justice system, and the fact that the incidents underlying his two pending cases happened only weeks apart. *See* Rule 5-409(F)(6)(e). Moreover, the PSA flagged Defendant as a risk for committing new violent crimes if released pretrial. *See* Rule 5-409(F)(6)(g).

{52}    Finally, although Defendant has not been ordered detained in another pending case based on a finding of dangerousness, *see* Rule 5-409(F)(6)(f) he was detained pretrial without bond for nearly a year in his previous homicide case, then was held on a $1,000,000 bond for the remainder of the pretrial period. That pretrial detention was almost certainly intended to be preventative detention, although it took place

prior to the amendment to Article II, Section 13 that allowed for pretrial detention upon a finding of dangerousness.[2]

{53}    The totality of these circumstances indicates that Defendant has an extensive and undeniable history of violence, noncompliance, and continual law and rule breaking. "We agree with the United States Supreme Court that under our American system of justice 'liberty is the norm, and detention prior to trial or without trial is the carefully limited exception.'" *Groves*, 2018-NMSC-006, ¶ 44 (quoting *United States v. Salerno*, 481 U.S. 739, 755 (1987)). However, "in this case and on this record . . . this defendant has earned a place in that carefully limited exception, not as punishment for [his] past acts but to protect others from [his] predictable future dangerousness." *Id.*

---

[2]Under the pretrial release and detention framework in existence at that time, district courts routinely set bail at an amount that the defendant likely could not pay so that the defendant would be effectively detained pretrial. *See Torrez*, 2018-NMSC-005, ¶ 105 ("It is common knowledge among judges and others who have worked in our courts that in the vast majority of cases imposition of high-dollar bonds . . . is an effort to deny defendants the opportunity . . . [for] pretrial release."). Thus, we note that when the district court set Defendant's bail at $1,000,000 in 2011, it likely did so with the intention to deny Defendant the possibility of pretrial release.

**D.** **District Courts Must Consider All of the Rule 5-409 Factors, Including a Defendant's Patterns of Compliance and the Possible Consequences of Noncompliance, When Analyzing the Release-Conditions Prong of the Pretrial Detention Inquiry**

{54} The errors in this case demonstrate a need for additional guidance from this Court on the proper application of the Rule 5-409 factors to the second prong of the detention analysis. Our existing precedent on pretrial detention largely focuses on the first prong, dangerousness, rather than the second, release conditions. We take this opportunity to clarify the analysis to be used when district courts rule on this second prong.

{55} As a threshold matter, we note that all of the Rule 5-409 factors expressly apply to both prongs of the detention analysis. All factors are relevant to both prongs because a defendant's dangerousness is not an entirely separate consideration from whether release conditions can reasonably protect the safety of the public; rather, the nature of the defendant's dangerousness informs whether the public can be kept reasonably safe from that danger by the imposition of release conditions. Thus, if a district court applies the Rule 5-409 factors and determines that a defendant is dangerous, it should not cordon off those facts that it considered in the dangerousness analysis and limit itself solely to the evidence that it did not yet consider in order to rule on release conditions.

{56}    Instead, in considering the release-conditions prong of the detention analysis, like in the initial dangerousness analysis, the district court should take a holistic, commonsense approach. This second prong of the pretrial detention analysis, like the first prong of dangerousness, must be proven by clear and convincing evidence. Rule 5-409(A), (F)(4), (G), (H). However, the State must only prove that no release conditions can *reasonably* protect the public, not that no release conditions can *possibly* protect the public. *See Groves*, 2018-NMSC-006, ¶ 37 ("The determination whether available release conditions would *reasonably protect* others does not require scientific accuracy any more than any other prediction of future human behavior. The key word is *reasonably*, which requires the exercise of reasoned judgment."); *see also Torrez*, 2018-NMSC-005, ¶ 103 ("[T]he New Mexico Constitution, applicable court rules, and judicial precedents here and elsewhere all refer to the need for reasonableness in pretrial release and detention decisions.").

{57}    Certainly, the district court must consider patterns in a defendant's past behavior. "Both law and behavioral science recognize that in anticipating human behavior, one of the predictive tools is the consideration of one's character traits

27

based on patterns of past conduct." *Torrez*, 2018-NMSC-005, ¶ 101 (text only)[3] (citation omitted). Thus, we have recognized that if "a defendant has engaged in dangerous behavior while on supervised release or has refused to follow court-ordered conditions of release in the past," *Torrez*, 2018-NMSC-005, ¶ 102, the district court may reasonably infer that the defendant will be unlikely to abide by release conditions in the future. Similarly, we have stated that a defendant's past "pattern of refusal to comply with directions of the courts [or] of police," *Groves*, 2018-NMSC-006, ¶ 38, can indicate that the defendant likely will not comply with release conditions. That is, if a defendant has a pattern of disregarding official directives, it is certainly reasonable to infer that the defendant is unlikely to comply with any conditions of release that the district court could impose in the future.

{58} But a defendant's disregard for official directives is not the only concern in the second prong of the detention analysis. The central concern of the second prong is public safety: whether "release conditions will reasonably protect the safety of any other person or the community." Rule 5-409(F)(4). Thus, the district court must consider not only whether a defendant is likely to comply with release conditions

---

[3]The "(text only)" parenthetical indicates the omission of nonessential punctuation marks—including internal quotation marks, ellipses, and brackets—that are present in the text of the quoted source, leaving the quoted text otherwise unchanged.

but also the likely consequences to any person or the community should a defendant fail to comply.

{59} That additional inquiry is related to, and must be viewed in light of, the magnitude of a defendant's dangerousness. For example, a defendant with a history of violent crimes who stands accused of a new violent crime may pose a significant and unjustifiable risk to the safety of any person or the community if the defendant fails to comply with release conditions. *See, e.g.*, *Torrez*, 2018-NMSC-005, ¶¶ 15, 20 (noting that the defendant was charged with shooting his girlfriend in the abdomen, and reciting the prosecution's proffer of the defendant's history of prior violent crimes). In contrast, a defendant who is accused of a string of property crimes may not pose the same level of risk to community safety in the event of noncompliance even though that defendant may have been found to be dangerous due to the repeated pattern of criminality. *See, e.g.*, *Mascareno-Haidle*, 2022-NMSC-015, ¶¶ 17, 33 (holding that the defendant's alleged pattern of burglaries, without more, did not show that no release conditions could reasonably protect the community). And the risk to public safety posed by a particular defendant may be somewhere in between, which is why the district court must evaluate each case on its particular facts and consider the totality of the circumstances.

{60} To be clear, this is not to say that the district court may rely solely on the charged offense to order a defendant's detention. The district court cannot do so. *See Brown*, 2014-NMSC-038, ¶ 51. Instead, the district court must consider all facts relevant to the detention inquiry, including each of the factors listed in Rule 5-409(F)(6), as they apply to each prong. *See Mascareno-Haidle*, 2022-NMSC-015, ¶ 39 ("Rule 5-409[] . . . require[s] a detention court to engage in a delicate case-by-case balancing of *all* relevant factors."). We emphasize that the district court must always conduct a totality of the circumstances analysis in reaching a decision on pretrial detention, as set forth in our case law and Rule 5-409(F)(6).

## III.  CONCLUSION

{61} For the foregoing reasons, we hold that the district court abused its discretion when it denied the State's motion for pretrial detention. Accordingly, we reverse.

{62}  **IT IS SO ORDERED**.

_____

**BRIANA H. ZAMORA, Justice**

**WE CONCUR:**

_____

**C. SHANNON BACON, Chief Justice**

_____

**MICHAEL E. VIGIL, Justice**


_____

**DAVID K. THOMSON, Justice**


_____

**JULIE J. VARGAS, Justice**